879 P.2d 772

**ALBUQUERQUE CONCRETE CORING COMPANY, INC., a New Mexico corporation, Plaintiff–Appellee,**

v.

**PAN AM WORLD SERVICES, INC., Defendant–Appellant.**

**No. 20205.**

Supreme Court of New Mexico.

July 27, 1994.

Montgomery & Andrews, Victor R. Ortega, Sarah M. Singleton, Michael Shickich, Santa Fe, for appellant.

Robert J. Avila, P.A., Robert J. Avila, Timothy M. Padilla & Associates, Deborah Davis Walker, Albuquerque, for appellee.

## OPINION

FROST, Justice.

This is an appeal from a judgment awarding compensatory and punitive damages to Plaintiff–Appellee Albuquerque Concrete Coring Company, Inc. (ACC) against Defendant–Appellant Pan Am World Services, Inc. (Pan Am). Pan Am disputes only the district court's award of punitive damages. This case raises two issues: (1) whether there is substantial evidence of corporate authorization or ratification to support the award of punitive damages, and (2) whether Pan Am may be liable for punitive damages based upon the misconduct of its agent acting within his scope of employment in a "managerial capacity" and, if so, whether there is substantial evidence of such corporate participation as to support the award of punitive damages. We affirm.

## FACTS

Pan Am provided general construction services to the Los Alamos National Laboratory, and Pan Am subcontracted work to ACC on a project at the Lab. Shortly after beginning work, ACC encountered conditions at the job site that were different from the specifications in its subcontract with Pan Am. ACC informed Pan Am that the different conditions would make its work more difficult and more expensive, and it requested a change order for an appropriate adjustment in its fee from Pan Am.

Pan Am's response to ACC's request touched off a series of negotiations that eventually led to this lawsuit. Pan Am initially would not honor ACC's request for a fee increase, stating instead that it would investigate the problem and make a contract adjustment after the project was completed. This response was not satisfactory to ACC, and it made written requests for its increased expenses and fees. ACC's requests were to no avail, however, and eventually the trial court awarded it $66,500 in compensatory damages.

Based upon actions by William D. Adams, an employee of Pan Am, the trial court also awarded $133,000 punitive damages to ACC. The court found that Adams's statements to ACC were false and that he intentionally made these misrepresentations to coerce ACC into completing the job. For example, in response to ACC's threat to walk off the job after nonpayment, Adams stated to ACC officials that ACC would be "blackballed" from all future government contract work and would be liable for the costs of completion if it abandoned the job. The trial court also found that Pan Am made material misrepresentations to ACC to the effect that it would make an equitable adjustment to the subcontract and induced ACC to perform additional work that it did not intend to pay for.

Finally, the trial court found that Pan Am acted in bad faith when it denied ACC's contract adjustment. When ACC submitted an invoice to Pan Am for its services in addition to the contract price, Adams, on behalf of Pan Am, denied this additional invoice. Adams denied additional compensation on the pretext that the invoice was not supported by the necessary documentation, but the trial court found that Pan Am was at all times in possession of the necessary documentation and intentionally ignored it. The trial court assessed punitive damages against Pan Am for Adams's material misrepresentations and bad faith.

The district court's assessment of punitive damages against Pan Am appears based exclusively on conduct by Adams, though other Pan Am employees were tangentially involved. Based upon the trial transcripts, Adams evidently held the title of Administration Manager on the project. Adams directed Jesse Castanon, who held the title of Pan Am Contract Administrator for the subcontract to ACC, to deny ACC's requested adjustment even though Adams had not investigated the job site. Castanon and Adams reported to a Pan Am vice-president, S.J.

Calanni, who was apparently in charge of Pan Am's Los Alamos operations. Calanni may have been carbon-copied with the written denial of ACC's request for an adjustment.[1]

The district court did not make findings of fact regarding the title, responsibilities, or managerial capacity of Adams, Castanon, or Calanni. At trial, Adams testified that he held a position he would consider to be in "upper management," and that it was his responsibility to oversee projects like the one involving ACC when there was a contractual problem.

## DISCUSSION

The central issue in this case is whether Adams's conduct can be imputed to Pan Am. Pan Am argues that there was a simple failure of proof at trial regarding its direct involvement in any alleged culpable conduct. Pan Am claims that the trial court nowhere found that it authorized, ratified, or participated in any conduct by Adams. Pan Am also argues that Adams's conduct was not culpable. ACC, on the other hand, claims that substantial evidence supports the trial court's finding that Pan Am is liable for punitive damages for Adams's egregious misconduct.

## I. Applicability of Punitive Damages

Although punitive damages ordinarily are not allowed in breach of contract actions, *Stewart v. Potter*, 44 N.M. 460, 466, 104 P.2d 736, 740 (1940), in contract cases not involving insurance, a court may award punitive damages when the defendant's actions are malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights, *Romero v. Mervyn's*, 109 N.M. 249, 255, 784 P.2d 992, 998 (1989). *See also Construction Contracting & Management, Inc. v. McConnell*, 112 N.M. 371, 375, 815 P.2d 1161, 1165 (1991). Evidence of a culpable mental state is required because the purpose of punitive damages is to punish such conduct and to deter others from similar conduct. *McGinnis v. Honeywell, Inc.*, 110 N.M. 1, 9, 791 P.2d 452, 460 (1990).

Pan Am contests the district court's finding of fact characterizing Adams's conduct as fraudulent, malicious, and oppressive. It argues that his conduct was justifiable and not reprehensible, but we disagree. There is substantial evidence in the record to support the district court's finding that Adams's conduct was oppressive, malicious, and fraudulent. *See Brannock v. Brannock*, 104 N.M. 385, 387, 722 P.2d 636, 638 (1986) (describing substantial evidence standard of review).

## II. Corporate Liability for Punitive Damages Based upon Corporate Authorization or Ratification

Since we uphold the trial court's finding that Adams's conduct was culpable and warrants imposition of punitive damages, the next question is whether there is substantial evidence of Pan Am's authorization, ratification, or participation in Adams's conduct to justify the award of punitive damages against Pan Am. All conduct for which the trial court assessed punitive damages against Pan Am apparently arose out of the acts by Adams.

It is a well-established rule in New Mexico that a principal may be held liable for punitive damages when the principal has in some way authorized, ratified, or participated in the wanton, oppressive, malicious, fraudulent, or criminal acts of its agent. *See Samedan Oil Corp. v. Neeld*, 91 N.M. 599, 601, 577 P.2d 1245, 1247 (1978). An "employer is liable for punitive damages for the tortious act of an employee acting within the scope of his employment *and* where the employer in some way participated in, authorized or ratified the tortious conduct of the employee." *Newberry v. Allied Stores, Inc.*, 108 N.M. 424, 431, 773 P.2d 1231, 1238 (1989) (emphasis in original).

The district court did not make any specific findings or conclusions regarding whether Pan Am authorized, ratified, or participated in the culpable conduct of Adams. ACC points out, however, that in its findings of fact the district court stated: "Pan Am, at all times material hereto, acted through its duly authorized employees, acting within the

1. Our assumptions on these factual matters are based upon the record and transcripts.

course and scope of their employment." ACC argues that the phrase "acted through its duly authorized employees" is synonymous with corporate participation. In addition, ACC assumes that as long as a vice-president of Pan Am received documents informing him of Adams's conduct, that was enough to symbolize corporate participation. Conversely, Pan Am claims that there is no evidence in the record of corporate authorization, ratification, or participation in the culpable conduct by Adams. Pan Am asserts that Adams's misconduct cannot generate punitive damages against Pan Am because although Adams acted within the scope of his employment, independent involvement by the employer through authorization, ratification, or participation is required and is absent here. *See id.*

 ACC also claims that an argument can be made that Pan Am's complicity is shown through its acceptance of the benefits of Adams's conduct. A corporation can ratify the acts of its agents by acquiescence in or acceptance of the unauthorized acts. *Bank of Santa Fe v. Honey Boy Haven, Inc.,* 106 N.M. 584, 587, 746 P.2d 1116, 1119 (1987). ACC argues that Calanni, a Pan Am vice-president, received carbon copies of Adams's denial of the contract adjustment yet did nothing to distance Pan Am from the action or to reverse Adams's decision. We note that there is no indication in the record or transcripts that Calanni had knowledge of the circumstances surrounding Adams's decision not to pay ACC or Adams's misconduct in dealing with ACC. Under these circumstances, something more than Calanni's receipt of a document which supposedly represents culpable conduct must be shown to establish corporate complicity through authorization, ratification, or participation and thereby support the punitive damages award against Pan Am.

 ACC is correct in alleging that Pan Am defended its breach of contract to the very end. Accepting the benefits of a breach of contract, however, is not the same as accepting the benefits of malicious or oppressive conduct or participating in or ratifying that conduct. A simple breach of contract does not, by itself, create a basis for punitive

damages without some showing of a culpable mental state or some other evidence of over-reaching, malicious, or wanton conduct. *Construction Contracting,* 112 N.M. at 375, 815 P.2d at 1165. ACC's argument that Pan Am ratified its employees' acts through acquiescence has no merit.

### III. Corporate Liability for Punitive Damages Based on Acts of Corporate Agent with Managerial Capacity

Pan Am argues that it is not liable for punitive damages based on Adams's misconduct because Adams was not an executive officer of Pan Am and he did not possess the "whole executive power" of the corporation such that his acts would constitute corporate authorization, ratification, or participation. Pan Am relies upon *Couillard v. Bank of New Mexico,* 89 N.M. 179, 184, 548 P.2d 459, 464 (Ct.App.1976), which held that participation by a corporation which would serve as a basis for the imposition of punitive damages may be based upon the tortious conduct of a corporate agent who possesses the "whole executive power" of the corporation. Pan Am further points to *Cornell v. Albuquerque Chemical Co.,* 92 N.M. 121, 126–27, 584 P.2d 168, 173–74 (Ct.App.1978), which applied *Couillard* and upheld punitive damages awarded against a corporation, concluding that a vice president possessed the "whole executive power" of the corporation.

In arguing its position, Pan Am urges a definition of "whole executive power" that is very restrictive and we feel impractical in today's business world. Pan Am clings to a definition similar to the concept first enunciated in *Lake Shore & M.S. Ry. Co. v. Prentice,* 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1893). In *Lake Shore,* the United States Supreme Court envisioned that the single, highest executive of a corporation, the corporation's "president and general manager, or, in his absence, the vice president in his place," could wield the "whole executive power" of the corporation and thereby cause corporate punitive liability. *Id.* at 114, 13 S.Ct. at 265. Because the facts of this case illustrate the shortcomings of such a definition of "whole executive power," we join the jurisdictions that follow the "managerial ca-

pacity" theory as articulated in the Restatements (Second) of Agency and Torts.

The Restatement (Second) of Agency, Section 217C, subsection (c), and the identical provision in the Restatement (Second) of Torts, Section 909, subsection (c), state, "Punitive damages can properly be awarded against a master or other principal because of an act by an agent if ... the agent was employed in a managerial capacity and was acting in the scope of employment." Restatement (Second) of Agency § 217C(c) (1957); Restatement (Second) of Torts § 909(c) (1977) [hereinafter "Restatement rule of managerial capacity"].[2]

Courts are divided over the issue of when a principal should be liable for punitive damages for the conduct of an agent if the principal has not authorized or ratified its agent's conduct, or participated in it by virtue of its agent's possession of a requisite amount of corporate discretionary authority. *See Fusselman v. Ennia Gen. Ins. Co. (In re P & E Boat Rentals, Inc.)*, 872 F.2d 642, 650 (5th Cir.1989); *Samedan Oil Corp. v. Neeld*, 91 N.M. 599, 603–04, 577 P.2d 1245, 1249–50 (1978) (Easley, J., dissenting). *See generally* 2 James D. Ghiardi & John J. Kircher, *Punitive Damages* §§ 24.01 to 24.10 (1987) ("Vicarious Liability for Punitive Damages"). Several jurisdictions expressly adopt the Restatement rule of managerial capacity. *See, e.g., Protectus v. North Pac. Grain Growers, Inc.*, 767 F.2d 1379, 1386 (9th Cir.1985); *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 697–98, 620 P.2d 141, 147–48 (1979), *cert. denied and appeal dismissed*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980); *Abshire v. Stoller*, 235 Ill.App.3d 849, 176 Ill.Dec. 559, 564, 601 N.E.2d 1257, 1261 (1992), *appeal denied*, 148 Ill.2d 639, 183 Ill.Dec. 15, 610 N.E.2d 1259 (1993); *Kline v. Multi–Media Cablevision,*

*Inc.*, 233 Kan. 988, 666 P.2d 711, 716 (1983); *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex.1967).

Under the Restatement rule of managerial capacity, Pan Am is liable for punitive damages caused by the conduct of Adams if Adams possessed "managerial capacity" in his dealings with ACC. Defining "managerial capacity," the Supreme Court of California wrote, "The determination whether employees act in a managerial capacity, however, does not necessarily hinge on their 'level' in the corporate hierarchy. Rather, the critical inquiry is the degree of discretion the employees possess in making decisions that will ultimately determine corporate policy." *Egan*, 620 P.2d at 148. In *Abshire*, the Appellate Court of Illinois defined a managerial employee as one who "formulates, determines and effectuates his employer's policies, one with discretion or authority to make ultimate determinations independent of company consideration and approval of whether a policy should be adopted." 601 N.E.2d at 1263 (quoting *Kemner v. Monsanto Co.*, 217 Ill.App.3d 188, 160 Ill.Dec. 192, 203, 576 N.E.2d 1146, 1157, *appeal denied*, 142 Ill.2d 655, 164 Ill.Dec. 918, 584 N.E.2d 130 (1991)). A key in determining whether an agent acts in a managerial capacity is to look at the nature of what the agent is authorized to do by the principal and whether the individual has discretion regarding both what is done and how it is done. Job titles, in and of themselves, are not necessarily dispositive. *See Egan*, 620 P.2d at 148.

We therefore do not think it is helpful in this context to attempt to analyze an agent's authority in terms of "whole executive power," a phrase which commonly is understood to refer to only a few members of the corporation who hold plenary authority for the corporation. We prefer to address

---

**2.** Restatement (Second) of Agency § 217C and Restatement (Second) of Torts § 909 state in their entirety:

Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if:

(a) the principal authorized the doing and the manner of the act, or

(b) the agent was unfit and the principal was reckless in employing him, or

(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

(d) the principal or a managerial agent of the principal ratified or approved the act.

Though we adopt subsection (c) today, we do not address the other subsections of this rule.

this issue in terms of the Restatement concept of an agent with "managerial capacity." By this we refer to one who has discretionary or policy-making authority as described herein.

While retaining the philosophy that corporations should not be liable for punitive damages absent corporate culpability, imposition of corporate punitive damages based upon the theory of managerial capacity tends to deter the employment of unfit persons for important positions, see Restatement (Second) of Torts § 909 cmt. b, and encourage their supervision. The facts of this case illustrate another important reason for imposing punitive damages on a principal for the bad acts of its agent with managerial capacity. In the modern world of multinational corporations, corporate control must be delegated to managing agents who may not possess the requisite upper-level executive authority traditionally considered necessary to trigger imposition of corporate liability for punitive damages. See Doralee Estates, Inc. v. Cities Serv. Oil Co., 569 F.2d 716, 722 (2d Cir.1977) ("To hold that punitive damages may not be imposed unless there is participation ... by the highest corporate executives is unrealistic given the size of giant corporations...."). If we were to adopt the position that misconduct by managing agents who actually control daily operations is not sufficient to trigger corporate punitive damages, large corporations that routinely delegate managerial authority to shape corporate policy by making important corporate decisions could unfairly escape liability for punitive damages by virtue of their size. Corporate liability for punitive damages should depend upon corporate responsibility for wrongdoing, not corporate ability to insulate top executives from daily, hands-on management, i.e. only through exercising the "whole executive power" of the corporation. Our decision today accommodates modern practicalities. We do not, however, change the requirement that to incur punitive damages, a corporation must itself be culpable. When a corporate agent with managerial capacity acts on behalf of the corporation, pursuant to the theoretical underpinnings of the Restatement rule of managerial capacity, his acts are the acts of the corporation; the corporation has participated.

In adopting the Restatement rule of managerial capacity, we disavow statements in New Mexico case law implicitly rejecting this concept. See, e.g., Samedan, 91 N.M. at 601, 603–04, 577 P.2d at 1245, 1247–48 (Easley, J., dissenting) (implying that Restatement rule of managerial capacity is not applicable in New Mexico).

■ Substantial evidence in the record demonstrates that Adams possessed managerial capacity. It is clear that Adams was in charge of negotiations with ACC and oversight of its contract and could independently make decisions regarding claims against Pan Am which were binding on the corporation. By his own admission, Adams was in "upper management." Adams had plenary discretionary authority to determine Pan Am's policies in its dealings with ACC. See Egan, 620 P.2d at 148. Because Adams had managerial capacity, his misconduct was correctly attributed to Pan Am, constituting corporate participation and warranting punitive damages.

## CONCLUSION

Substantial evidence in the record supports the district court's finding that Adams's misconduct warranted punitive damages. Due to Adams's managerial capacity in his position with Pan Am, his misconduct is attributed to Pan Am such that corporate punitive damages are appropriate. We therefore affirm the district court's award of compensatory and punitive damages.

**IT IS SO ORDERED.**

RANSOM and FRANCHINI, JJ., concur.